Judge Simpson
delivered the opinion of the Court.
Eliza Ann Hamilton died on the 9th day of August, 1844. At the time of her death she was about thirty five or six years of age, and unmarried. Two days previous to the day on which she died, she executed an instrument of writing, purporting to be her last will and testament, containing, among others, the following provisions, viz:
“ I will all my servants to be free, both those I ana entitled to as an heir of my father, Archibald Hamilton, deceased, at this time, and those that I will be entitled to, as an heir of my father, at my mother’s death, and also my portion of the servants of my sister, Maria Hamilton, deceased. And if said servants will go to Liberia, in-Africa, I will each one of them one hundred dollars,• but if they do not go to Liberia, I will them fifty dollars each, on their permanent removal to a free State. I will that my servants have what they earn, after the first day of January next, that is, over and above their expenses and the expense of attending to them.”
“ I will and appoint my uncle, John Berry, my executor ; and I do leave it entirely at his discretion when my servants shall be free, where they shall go to, and how they shall be employed, and all matters else that I have not stated that concerns them.”
“ I will that one thousand dollars of my estate be given to educate poor men for the ministry of the Associate Reformed Church, if there be any that place themselves under the the care of the Associate Reformed Presbytery of Kentucky, to be paid at such time as my executor may think best. Or if there be no such *130 persons needing said money within a reasonable time^ then my executor may dispose of it in that way he may think best to promote the cause of the Associate Reformed Church in Kentucky, or elsewhere.”
“ I will three hundred dollars for my executor to use for benevolent purposes. I have given him directions how and when to apply it.”
“I will my uncles, James and John Beny, so much of all my estate, not already named in this will, as will indemnify and keep them safe from all loss, should there be any, as administrators of my father’s estate, and also to pay them reasonably for all their time and trouble in attending to and managing my father’s estate in the way and manner it has been done.”
“I will that the balance of my estate that may be left, after what I have disposed of in this will, be divided among my three brothers, one half of which to be George W. Hamilton’s, and the other half to be equally divided between James and A. W. Hamilton.”
Eliza A. Hamilton resided'in Bath county at the time of her death. The instrument of writing purporting, to be her last will and testament, was, after a full investigation of the testimony bearing upon all the questions made in relation to its validity, admitted to record as such, by the Bath County Court. Upon an appealfi’om that decision, to the Bath Circuit Court, it was held by that Court, that the will was valid as to the personal estate, but was invalid as to the land and slaves, upon the ground that William Berry, one of the two attesting witnesses to the will was an incompetent witness, and consequently that the writing was not executed in the manner the statute upon the subject requires wills to be executed for devising slaves and land. From the decision of the-Circuit Court, John Berry, the executor,, has appealed to this Court, and the other parties have assigned cross errors; so that the whole case is fully before this Court for determination.
To the proper understanding of the questions made and debated, the following statement of facts is neces-sary : In the year 1826, Archibald Hamilton, the father *131 of the testatrix, died, leaving a large estate, consisting of land, slaves and personalty. He left a widow and five children, namely, Eliza Ann, the testatrix, Maria, Archibald W., James and George. Administration on his estate was granted to Rebecca Hamilton, his widow, and to her brothers, John and James Berry. They executed the usual administration bond, with William Berry and others as their sureties. John Berry, who seems never to have married, resided with his sister, Rebecca Hamilton, after her husband’s death, and, as administrator, had the chief management of the estate. No dower was alotied to the widow, nor was the estate divided among the children.. The land was not rented out, nor the slaves hired, nor the personal property sold; but the whole estate was kept together, and managed for the joint benefit of the whole family. The business was ably and prudently conducted, and has resulted in a large accession to the estate, in the way of money and property. This mode of managing the estate was adopted by John Berry, as administrator, at the instance of the widow, and those of the children who, at the time, were old enough to have a wish upon'the subject. It was continued by him until the death of the testatrix, Eliza Ann, without any objection, so far as appears, by any of the children ; and apparently with the assent and approbation of them all. Some few years prior to her death, an attempt was made by the County Court Commissioners to settle the estate with the acting administrator. The settlement, so far as it was progressed with, charged the administrator with the rents of the land, the hires of the slaves, and the value of the unsold personal estate, and with interest on all, regarding him as legally the renter of the land, the hirer of the slaves, and the purchaser of the personal estate. The aggregate of these charges formed a very large sum, but the expenditures by the administrator for improvements and the support and education of the family, and his investments of the profits of the farm in lands for the benefit of the estate, were not taken into the estimate, nor was' the settlement comp e- *132 ted. Serious apprehensions, however, seem to have been entertained by the administrator, that he would incur a considerable loss if the estate should be settled upon the proposed plan. Whether any of the younger children required the estate to be settled in that way. does not appear. But the widow, Mrs. Hamilton, the testatrix, Eliza Ann, and her sister Maria, who was then living, said at the time, and afterwards repeatedly told John Berry, that they would indemnify him against all loss on account of the management of the estate, stating that it had been managed satisfactorily, and agreeably to their wishes, Maria died unmarried and childless and intestate, some years before her sister Eliza Ann. The latter, at the time of her father’s death, was about eighteen years of age; the other children were all younger than her.
The testimony tomakeTwfli!7
The will under consideration is contested, and its validity objected to,
First, on an alleged want of capacity in the testatrix; Second, on the ground that its execution was fraudulently procured by John Berry, by the exercise of undue influence;
Third, because William Berry, one of the subscribing witnesses to the will, is the surety of John Berry, in the bond given by him as the administrator of Archibald Hamilton, deceased, and has, therefore, as is contended, an interest in the establishment of the will, which renders him incompetent as a witness.
1. The weight of the evidence is decidedly in favor of the conclusion, that the testatrix was in full possesS10n and exercise of her mental faculties, at the time the will was executed. The only evidence that seems to throw a shadow of doubt upon this conclusion, is that given by a majority of the physicians, who testified in relation to the character of the disease under which she labored, and its invariable effects upon the mind of the patient previous to dissolution. They proved that her disease was tuburcular consumption,, and that the death of a patient laboring under such disease is uniformly preceded by phrensy.. If this were *133 the disease that resulted in her death, about which the testimony is conflicting, still, it does not appear that this state of phrensy had commenced at the time the will was executed. The subscribing witnesses to the will, and the mother of the testatrix, prove that she was in her right mind at the time. Her brother George, who is manifestly opposed to the establishment of the will, states that he saw nothing indicating alienation of mind, but, on the contrary, his sister appeared to be perfectly rational. The will was made two days before the death of the testatrix. The day subsequent to the one on which it was executed, a physician was in attendance, who remained with her until she- died-His evidence is mainly relied upon to prove incapacity. He states that previous to her death she had spells of drowsy, dreamy wanderings ; that she was extremely weak and worn down with her disease, which was of a very debilitating nature. At what time she was first attacked with these spells of dreamy wanderings he-does not state. But he proves that even when laboring under these spells, after she was fully aroused, she appeared to be perfectly rational; that lie discovered no disease of the brain, and in his opinion, although weak,, she might even then have been capable of disposing of a complicated estate, provided she had previously reflected on the subject.
2. The testatrix was a woman of strong and vigorous, intellect. Her opinions were formed with deliberation and adhered to with firmness. She entertained conscientious scruples .upon the subject of slavery, but was-very decidedly of the opinion that slaves should not be manumitted without previous preparation. She repeatedly expressed her determination that her slaves should never serve any other person but herself. Her intention to emancipate them at her death, was evident from all her conversations on the subject. With her it was not only a desire, but she felt it to be a moral duty.
There can be no doubt that she regarded her uncle John Berry with affection and confidence. He resided for many years in the family, and acted as a parent in, *134 controlling the business of the estate, and promoting the interest of the children. His advice was heeded and his counsels had their due influence. He had managed the estate in the way the testatrix desired. The slaves, instead of being hired out, had been kept at home and treated with kindness. Their number had increased, and the young had been reared. The land, instead of having been rented out and abused, had been cultivated and improved. The profits arising from the labor of the slaves and the cultivation of the land, had been brought into a common fund for the benefit of all who were interested in the estate. This mode of managing the estate might result in a loss to the administrator, if he should be required to account upon the principles of the attempted settlement. The testatrix felt that such a loss ought not to be sustained by him. His conduct relative to the estate, if not produced by an expression of.the wishes of herself and mother, had met with their hearty approbation. That it should eventuate in his loss, was, according to her feelings, manifestly unjust. She therefore expressed her determination, repeatedly, that he should sustain no loss on that account. To indemnify him against this danger, was also, with her, a moral duty, the performance of which she felt to be incumbent upon her.
The emancipation of her slaves, and the indemnity of her father’s administrator, are the leading provisions of her will; and from them, the exercise of an improper influence, on the part of her uncle John Berry, in procuring the excution of the will, is mainly inferred.
These two subjects she had deliberated upon when enjoying good health. Her determination upon both . had been fully formed and'openly and repeatedly avowed. Her fixed resolve to make a will, and not to die intestate, is deducible from her declarations on these subjects. Shortly before her death, she requested a minister of the gospel, who was in the habit of calling upon her daily, to omit his visits for one day, as she had set apart that day to arrange her worldly affairs. He does not certainly recollect it was the day the will *135 bears date, that was designated by her. But there is no reason to doubt it. Her brother George had three conversations with her in reference to the execution of a will, in one of which she spoke of emancipating her slaves, and devising to him one half of her estate. There is no evidence that John Berry ever persuaded her to make a will. Her will is in his hand writing, but no implication of an improper influence arises from that fact. It was natural that she should apply to him to write it for her, and that she should consult him in relation to its provisions. From her character, as portrayed by the testimony in the cause, it may be inferred that, as it regards both the execution of the will and the disposition of her estate, she was actuated by a strong sense of duty.
The Chancellor' has power and will control a trustee in the exercise of his-power to effectuate the purpo" ses of the trust.
But it has been argued that all the provisions of the will, in reference to the emancipation of the slaves and the donations for charitable uses, are so framed as to give to John Berry unlimited power and discretion over these matters, and were really designed by him to operate exclusively for his own benefit; and hence arises, as is contended, another urgent proof of his fraud and improper influence.
This position, however, is wrong in the premises, and must therefore be erroneous in its conclusion. The discretionary power given to him, is in the character of trustee; it must be exercised for the benefit of the objects of the testatrix’s bounty, and cannot in any manner be made to operate to his advantage. For the proper exercise of this discretionary power, he is responsible in a Court' of Chancery. If he should fail to do his duty,its performance will be enforced by the Chancellor, So1 long as he retains the slaves in bondage, the proceeds-of their labor belong to them. Should he refuse to emancipate them in a reasonable time, a Court of Chancery would compel him to execute faithfully the will of the testatrix. A discretionary power as it regards the slaves, was necessarily vested in the trustee to enable him to effectuate fully the views and intention of the testatrix on the subject of emancipation. So, in refers *136 ence to the provisions of the will for charitable purposes; no advantage can result to the trustee by a failure to appropriate the fund as required by the will. If never applied in that way, it will belong to the distributees, and if its application were suspended an unreasonable time, the Chancellor would enforce, on the part of the trustee, a performance of his duty. The assumption, therefore, of the want of capacity in the testatrix, or the procurement of the execution of the will by the fraud, or undue influence, of John Berry, is not sustained by the testimony in the record.
A will to pass land and slaves must be attested by two witnesses. argu.
' 3. The most material point in the cause, relates to the competency of one of th,e attesting witnesses to the will. Our-statute of wills requires that the will, if not wholly written by the testator or testatrix, shall be attested by two or more competent witnesses, subscribing , their names in his or her presence. If William Berry, one of the attesting witnesses, is incompetent, the will is not executed, so that the devises contained in it, upon the subject of land and slaves, can have a legal operation. The objection to his competency, is based upon the fact, that he. is one of the sureties of John Berry in the bond executed by him as administrator of Archibald Hamilton, deceased. The will under consideration, contains a devise of so much of the estate of the testatrix, as will indemnify John Berry and keep him safe from all loss, should there be any as administrator of that estate.
It is contended, and was so held by the Circuit Judge, that this, according to the true import of the will, is a devise to relieve the administrator from the payment of such sums as he should be found indebted to the estate; and not merely from the payment of the difference in the indebtedness, that might result from a settlement upon the principles the estate was administered by him, and one holding him accountable for profits that might have resulted from an administration of the estate in a mode that was strictly legal. Consequently the surety has a direct interest in the establishment of the will, *137 which, in effect, by discharging his principal, releases him from a direct and certain liability.
A witness to a will in which it was prdvided. that the administrator of the father of the testatrix should be exonerated from. any loss as such, not however exoneratlng him from any legal liability; B eld that the surety of the administrator was not by such provision of the will rendered an incompetent™^ ness to prove the will.
This construction of the will, violates the language used.by the testatrix, and is opposed to her intention, as developed by all the facts which have any reference to the matter. The devise is made trator from “loss,” “ no loss, nothing passes by the devise. There is nothto save the adminisshould there be any.” It thfere be ing given to him unconditionally — it is expressly upon the condition that he is subjected to a loss as administrator. If he be required to pay to the heirs, only that which he has received, or realized as the profits of the estate, he loses nothing — he merely pays out what he holds in trust for them. But on the contrary, should J he be regarded as the legal purchaser of the personal estate, and the legal renter of the land, and hirer of the slaves, and be required to account accordingly, and by this operation be brought in debt to the estate for a sum exceeding that which be has actually realized from its management, then the difference would constitute a loss, because he would be compelled to pay that which he had never received. This was the nature of the loss that was apprehended. It was this loss the testatrix declared that he should not sustain, because he had managed the estate according to her wishes on the subject. Whether the administrator, if required to settle the estate upon principles different from those upon which it had been managed by him, would incur any loss, was uncertain. There was, therefore, a propriety in the use of the language by the testatrix, that he was to be indemnified against such loss “should there be any.” Had she intended to absolve him from the payment of what he owed to the distributees, as administrator, or which would have been the same, in effect, to devise to him an amount equal thereto, the use of such qualifying language would have been wholly inappropriate'. The estate was in his hands unsettled and undistributed. That he had the control, as administrator, of a large estate, to which the distributees were entitled; was a fact clear, certain, and undisputed. Had she in *138 tended then to devise to him so much of her estate as would enable him to pay to the distributees what he owed to them, the qualifying language used, would have been not only unnecessary, but improper; and, instead of saving him from loss, she would have been giving him a sum equal to the amount he had in his hands belonging to the heirs of her father, whatever that might be. The intention of the testatrix, by this devise, was merely to indemnify him against any loss that he might incur, and not to bequeath to him any part of her estate absolutely and unconditionally.
A remote contingent interest in the provisions of a will, will not disqualify an. attesting witness from proving it; the evidence of disqualification of a witness rests on the objector.
Considering this to be the true import of the will, the question occurs, whether the attesting witness has such an interest in its establishment as renders him incompetent.
The interest, if any, is remote, contingent, and uncertain, on two grounds. In the first place, it is doubtful whether, under the circumstances, the legal liability of the administrator would, in a Court of Equity, be regarded as exceeding the actual proceeds of the estate. So far as the distributees had an agency in inducing him, in the first instance, to manage the estate in the mode which he adopted, or to continue that course after it was adopted, he would certainly be exempt from all responsibility for not having managed it in a different mode. ■ In the next place, it does not appear, with any degree of certainty, that there would be “ any loss,” if he were held to a strict account for the value of the personal estate, and -treated as the renter of the land, and hirer of the slaves. The farm and business of the estate generally, have been conducted by him with unusual skill, prudence and care. The profits have been carefully husbanded, and invested profitably in loans of money and purchases of land. The family have been maintained and educated, the young slaves reared, and the lands considerably improved. If these matters were all taken into the estimate, and the administrator credited by his actual disbursements, and a reasonable and fair value placed upon the land purchas,, sd. by him, the proceeds of the estate, for aught that *139 appears, may exceed the amount with which he would be chargable.
competency of the witness. And it is incumbent on the party objecting to the testimony, to satisfy the Court of the interest of the witness: Higgins vs Morrison's executor, (4 Dana, 136;) Anderson's administrator vs Irwin, (5 B. Monroe, 488.) Whether, therefore, there exists any loss is a matter of doubt and uncertainty. If none exists, the surety has no possible interest in the establishment of the will. The interest, which according to the well settled doctrine on the subject, excludes a witness, must be a certain and fixed, and not an uncertain or contingent interest. Whenever the interest is remote and of a doubtful nature, the objection goes to the credit and not to the
But supposing a loss to exist, and this devise in the will to take effect, what direct and certain benefit can the witness derive from it 1 Had the testatrix, in that event, had the power to release the administrator from the loss, and such had been the legal operation of the devise, the surety would have had an evident interest in the establishment of the will, as he would thereby, as well as his principal, be released from a direct and certain liability. But the devise to the principal, is of so much of the estate of the téstatrix, as is sufficient for his indemnity. The extent of the loss having been ascertained, he would be entitled to the amount by virtue of the devise. The surety has no more interest in the mere augmentation of the estate of his principal under the operation of the devise, than he has in its increase in any other mode. It would hardly be contended that, as surety, he would be rendered incompetent to testify for his principal in another case, because his evidence would have a tendency to benefit the pecuniary condition of his principal, by enabling him to succeed in a controversy, in which he might have been defeated without the aid of such testimony. Unless, then, the surety would have some equitable right to have the fund devised, applied to the payment of this liability, he has no greater interest that his principal should have the *140 benefit of the devise, than he has that he should obtain the same amount from any other source. Admitting that a Court of Equity might, inasmuch as the devise was made for a specified object, enforce its application so as to effectuate the intention of the testatrix, it could only do so if it appeared that the administrator was insolvent, or designed a wrongful appropriation of it to some other purpose, to the prejudice of the surety. So that the interest of .the surety would depend, not only upon the contingency of a loss, but if a loss was absolutely certain, then upon the additional contingency, that the administrator, before he obtained the benefit of the devise, would become insolvent, which could not well happen, as he would, as the executor, have the whole of the estate devised in his own hands.
The doctrine is well settled, as before remarked, that a remote or contingent interest does not disqualify a witness, but affects his credit only: Falls vs Belknap, (1 John. Rep., 491;) Stewart vs Kip, (5 John. Rep., 256;) Ten Eyck vs Bell, (5 Wendell, ;) Baker vs Arnold, (1 Cain Rep., 276;) Peterson vs Willing, (3 Dallas, 508.) The application of this doctrine in the present case, manifests conclusively the competency of the witness, and the error of the Circuit Court, in deciding that his testimony was inadmissable, and for the want of it, that the will could not be legally established. Both the subscribing witnesses prove satisfactorily the execution of the will. The testimony leaves no room to doubt the capacity of the testatrix. It sufficiently appears that she knew and fully comprehended the contents of the instrument. And in our judgment, the very slight circumstances relied upon to prove fraud, or any undue influence on the part of John Berry, in obtaining the execution of the will, are wholly inadequate for that purpose. We think, therefore, the instrument should have been admitted to record as the last will and testament of the testatrix, Eliza Ann Hamilton, deceased.
Wherefore, the order and judgment of the Circuit Court is reversed and cause remanded, with directions *141 to enter a judgment, affirming the order of the County Court establishing the will, and admitting it to record.
Robinson 4" Johnson for plaintiff; Apperson and Robertson for defendant.